All right, the next case for argument this morning is Calise v. Meta Platforms. Counsel, can you hear us? I can, Your Honor. Go ahead, Mr. Reich, when you're ready. May it please the Court and Counsel, my name is Mark Reich of the law firm of Levy Krasinski on behalf of Appellant Plaintiffs, and if it may, I'd like to reserve five minutes for rebuttal. Consider a website that posts third-party content without any involvement by the website other than hosting the messages or the ads or any other third-party content, and that third-party content turns out to be an offending post that gives rise to civil or criminal prosecution. This Court has viewed such scenarios to be protected under the Communications Decency Act, CDA, Section 220. Courts have also found scenarios in which claims were linked to unmistakably neutral tools used by the interactive computer service provider. Counsel, hold on, let me stop you there. There's a little bit of an echo, and if you can just slow down a little bit, it will help us hear you a little bit better. Thank you. I'm not sure I could help the echo, but I could certainly slow down. Go ahead, Counsel. Okay. So, going back, courts have found that those scenarios in which claims were linked to unmistakably neutral tools used by the computer service provider, then CDA protection would be afforded in those cases as well. And whether we look at DIRAF, the ultimate software group, where the Court ruled that open text boxes were neutral tools, that did not amount to materially contributing to the unlawfulness of the content. Counselor, the Court can look at Kimsey v. Yelp, a similar fact pattern. Okay, before... And in both of those cases... Counsel, Counsel, Counsel, Counsel, before we jump into this, I want to get to a conceptual understanding here, because I felt like when I was reading the briefs, there was like two ships passing in the night. They just did not match up. And I think that's one thing that the District Court was struggling with. And part of that is understanding your claims. As I understand it, there's two theories under two different standards that apply to MEDA based on what the different actions that it may have been taking. So are you alleging any claims against MEDA in their capacity as an interactive computer service? No. Okay. Because you agree that those would be preempted. Those would be covered by 223. I'm sorry, I'm mixing my cases. Those would have Section 230 immunity. So all of your claims, and I think you're, at least according to our case law, you can sue them under both theories. Your claims are all related to MEDA's actions as an information content provider. Is that right? That's correct. Not as a publisher. We are solely focused on their actions, their conduct, and not the published material. Okay. So that is why we're only focused, we're not focused on any publishing material, the publisher standard here. We're only focused on whether they were creating or developing the content. Right? Right. Contributed to the wrongfulness. Which we've defined as creating or developing, right? Yes. Okay. And so that may have been, I just wanted to make sure I understood that, because I think that was kind of where you were jumping off, was going into the cases describing developing. But help me understand what allegations you've made here that say they were developing. Because we have specific cases that say, if you're just soliciting, if you're out there soliciting advertising, that is not developing. So what have they done differently here that gets you out of that? Well here they did much more than just solicit advertising from natural or regular sources. They went and solicited advertising from sources. Okay. Wait, wait, wait, wait, wait. I'm going to push back because you did a very sly move and you added a bunch of language to that. We've never said that soliciting from natural, how did you put it, natural and safe sources? I mean, that's your allegation, isn't it? That they sat in a room with a hundred advertisers knowing that 30% of them were likely going to put up scam advertisements and that's how they developed. Is that right? They had internal reports that confirmed that data for them and I'm not going to, I don't know that we have the allegations that make it seem as if they're nefarious, but in terms of development, they are developing the opportunity for it to be placed onto the site to begin with. These are ads that would never make it onto an American platform without the help of Facebook, without their solicitation, without their solicitation. That's true of any ad. So is that the allegation that makes this different? What if- No, that's not true of any ad, Your Honor, because any ad- Counsel, let me ask you this because as I understand it, there has to be an allegation that Facebook materially contributed to the content, the false advertisement. What allegations bring you the closest to that requirement? So that's what I was getting at with respect to the difference between setting up advertising that anyone can have access to that would be a regular advertiser versus the scenario that we have here. In a regular scenario, you have neutral tools, and that's the cases that Dyaroff and others have looked at. You have tools. You set them up. Everybody can use them in exactly the same way. Once those tools are not used neutrally or are known to not be used neutrally, that's when the cases start moving in a different direction. Here we have a very extreme example, unlike any of the precedent that's been before this We have a situation in which Facebook knew the percentages, knew the dollar amount that they were generating from these unlawful ads, and they went ahead and solicited those ads and enabled those people in China to circumvent. They may not have trained them directly to circumvent, but they opened the opportunity at these meetings, at these conferences, for them to circumvent the firewall that they would not have been able to press on Facebook. Let me stop you there. Let me make sure that I understand what you're saying. Everything you're saying so far suggests to me that your theory is based on Facebook providing the opportunity for the offending advertisements to be placed on their platform. Now I go back to my question. Was there any material contribution to the creation of actually the fraudulent advertisements themselves? Or was it just a situation where they enabled the advertisements to be placed on the platform? They enabled the false, the known false advertisements to be placed on the platform, but not in the normal course of business. This was not a situation where anyone who visited the site or anyone who visits a review site like Yelp or a site like Airbnb, where everyone's accessing it, placing their ads, looking at the ads in the regular course. These are ads that would not have made it onto the Facebook marketplace to begin with. These are ads that were enabled to be on the site because of their actions. Right. Once again, what I hear you saying is the opportunity to place the fraudulent ads. Don't you have to allege more than that, that you have to allege participation in the creation of the content of the ads themselves? And if you're disputing that, then tell me why and what case stands for that proposition. Right. So that was the next scenario that I was going to present to the court. So if I may, the scenario that we have here is a scenario in which the website posts third-party content, except this time, as your honors are identifying, they prompt or help the placement of the offending post when the poster could not have blocked, would otherwise have been posted on the website. Or this time, right, and this is even going further in our allegations of the complaint, the website defendant encourages the poster, despite knowing the high likelihood that it would result in an offending post. And Meta did both of those here and more. There is no precedent for this type of action. I still don't understand your theory. It is that they have internal documents, apparently, that say that 30% of these advertisements that are solicited in China are scams. But what if it was 10%? What if the internal memo said 10%? Would it then fall out? Then they would be entitled to Section 230 liability? That's not a question for 230 liability, immunity or liability, that's a question of fact as to whether or not they would have responsibility for the actions based on the percentages that were presented to them. So you're saying that should still go? You're saying that they would not have immunity even then if it was 10% because that's a factual question and a jury would then be able to determine whether they materially contribute or create it based on those facts? That's correct. What if it was 1%? Same question with the same answer. What if it was 0.01%? That question would hinge on whether or not they would be responsible under the cause of action as to whether they're immune to the liability under the cause of action is not dependent on percentages. You see where I'm going with this is you're basically arguing that there's no Section 230 liability where there's any possibility of scam and let's be clear, it may be much in China, but the idea that advertisements in the United States are, you know, not, there's no scam advertisements that come out of the United States is just not tenable. So you're basically arguing, I think that Section 230 liability just cannot apply where you're soliciting advertisements because there's always a chance that those advertisements could be fraudulent. There is always a chance except in this fact pattern as it was presented in the complaint and alleged in the complaint, they had a 30% chance and they were generating billions of dollars of revenues and it was to them worth going ahead and marketing and soliciting this business from the known scammers. So again, I think it's important that the factual question that we're asking here about whether or not this is just opening up advertising to anyone versus opening up advertising to a known scammer or group of known scammers. That's really the question and that's not a question as to whether or not immunity should apply. And your allegation that Facebook opened it up to known scammers, is that based just on the percentage of fraudulent ads? You're not saying that they knew specifically that this particular advertisement was false, right? It's just the group as a whole has a high percentage of fraudulent ads, that that's your allegation? Based on the information available to us at the complaint, that is our allegation. We have no known information that Facebook was allowing a specific situation in which they allowed a known scammer from a previous situation to get back onto the site in a knowing way. That's why I wanted to clarify because you said that they were targeting known scammers to allow them to place ads and I don't think the allegations that you have so far go that far. If that is the case, that question goes to whether or not we have sustained the merits of the actual cause of action. Not whether or not immunity under 230 would serve to protect MEDA from having that cause of action entertained by the court on a motion to dismiss. Same as the questions as to the percentages. If this was a question as to the percentage, the district court can look at that and say, well, is this something that gave rise where MEDA should have acted in a more reasonable way? But that's not the case. But Congress seems to have stepped in and addressed that question and said, as long as MEDA is not creating or developing, and I apologize, I say Congress did that. I think the creating or developing actually came from our case law, but our case law has said, as long as MEDA is not creating or developing, then they're not liable under 230. 230 gives them immunity and they're not a information content provider. And so I don't understand, and I think Judge Winn had asked this before, how this gets you across the developing threshold. There's no allegation that they were sitting up there saying, hey, here's some key words you can incorporate into your advertisements. Or are there such allegations? No. That's precisely the opposite. What we have not alleged is that they were providing verbiage. We have not alleged that they're providing- Doesn't that what you have to get, isn't that what you have to allege to get to creates or develops? I mean, to me, that's the normal understanding of the term. No, because if we brought allegations like those, we would fall closer to providing them with immunity. They would be entitled to immunity. They are relating to their publishing activity. We are- No, but then they would- Separate and apart. That's why I asked you out of the gate, because I don't agree with that. I think if they were providing the content, we'll hear from MEDA, but I think if they were providing the content, then they would be an information content provider, and then it wouldn't be based on their publishing or speaking activity. It would be based on whether they created or developed the ad. The contribution to the illegality is not focused solely on contribution to the verbiage, contribution to ad sets, or anything of the sorts. It's contribution to the illegality resulting to the cause of action that is brought by plaintiffs, and that is precisely what we're looking at here. We're looking at the action. We're looking at the conduct that Facebook took to allow these ads. Again, not just general ads where anybody in the country can place anything they want, and they might be scam ads, and they may not be. These were two steps, one, going to a group of known scammers that, two, had no ability to get onto this platform without training on circumventing the firewall that was in China. What's your best case? One of those steps, standing alone, would take away the immunity under 230, but collectively as a whole, they certainly do. What's your best case to show liability here on the part of the defendant? There are several cases out there, but a lot of them go against you. What's your best case? Yes, certainly, Your Honor. You know, I heard Your Honor asking that question to others before, and I was trying to think of the most analogous case, and there really aren't analogous cases because the cases that have found immunity have pointed towards neutral tools, and here, what we're talking about is conduct. We're talking about the contribution of allowing these ads to appear to begin with. We are focused solely on that conduct, and when the courts look at the conduct as opposed to just any link whatsoever to the publication, that would equate to a blanket immunity for any company, like Facebook, to violate any statute. No, that's not true. It would apply to a blanket immunity for posting ads, and that seems to be exactly what Congress said. What it doesn't allow them is blanket immunity if they materially contribute, and I just don't know that you get to, just because they sit in a room, I guess your argument is if they didn't sit down with this group of 100 or a group of I don't know how many, you know, and teach them how to get around the firewalls, that those ads never would have come up. That's your argument? That's the allegations. Well, right. Those are the allegations of the complaint. I understand, but how is that developing? That doesn't seem to be developing. Not in my understanding, my common understanding, you know, what I would consider a common understanding of developing. That doesn't seem to be developing the ads. Okay. This draws to one of the arguments made by defendant where they were comparing our case to the Dyaroff case, and I think I'm going to answer your collective questions in this way. We recognize as appellants that META did not require the China-based scammers to post specific content. We recognize that. We also acknowledge that the complaint does not allege that META made specific suggestions regarding the verbiage, and that covers the first two comparisons to Dyaroff where, according to META's briefing, Dyaroff says that Section 230 protects websites from liability where they do not require users to post specific content, they make suggestions regarding the content. So, the first two points under Dyaroff, we've already acknowledged to the court, but that's where the similarities really end between the cases. As to the third point, the contribution to the unlawful or objectionable posts, META focuses solely on the content, as your honors are also focusing today on the content, and that completely dodges any discussion of the conduct itself. We are focused on the conduct. Its role here are not publisher-related. They're not passive or neutral in any way. That passive or neutral aspect is crucially important because when they are setting out advertising for regular advertising, that's a neutral tool. When you add in solicitation and facilitation of getting the access to a site that they otherwise wouldn't have access to, that's no longer neutral, and that's in line with this court's reasoning in roommates, in which the decision was clear that 230 immunity would only apply where the offending post is effectuated without the prompting and without the help of the website provider, or where the website, and this is a quote from roommates, quote, does absolutely nothing to encourage, close quote, the offending post, or where the website serves as a mere passive conduit. And this rationale, as your honors are familiar with, is supported by HomeAway, in which the decision of processing transactions was separate from publishing. The court in HomeAway also stated, and I think it was quoting internet brands, that the underlying duty, quote, could have been satisfied without changes to content posted by the website's users, close quote. That applies here, too. This has nothing to do with asking them to change anything on their site, to change the language of the advertisements. It's stop getting them onto the platform to begin with. It's an American platform that would not, without their assistance, have any of these China-based ads in them. And those China-based ads, based on their own internal study, had a significant, high percentage of false ads. I see that my time is running out. I'm going to save the rest of my argument for rebuttal. Thank you. You're actually out of time. I'll put two minutes back on the clock for rebuttal. Let's hear from Mr. Boutros. Good morning, your honors. Theodore Boutros for EMETA. This is exactly the type of case that Section 230 was meant to prohibit. The causes of action here all hinge on the core allegation that the plaintiffs each saw a fraudulent, an allegedly fraudulent ad, they relied on that ad, and they made a purchase that they wouldn't have made. In the paragraphs 89 and 80 of the complaint, it's ER 112 and 109, make that same allegation as to both plaintiffs. So the claims hinge on META's failure to stop that content from getting on to the platform or failing to take it down before they saw it. They did ultimately take it down. But that's, I mean, your argument there seems to go to whether they're considered, for claims, to the extent that they are alleged, META is alleged to be an interactive computer service. And plaintiff has, I think, smartly said, we're not claiming that they fall within that bucket. We recognize there's publishing activity here. He seems to be saying, no, META can be treated as an information content provider. And this is where I think the district court kind of mixed apples and oranges a little bit. And so, I mean, if it's true that it's only the information content provider, then we're talking about whether there was material contribution, right? It is a little confusing. Just to clarify, in the court below, META argued that it was an interactive computer service, which plaintiffs didn't see. Which clearly, yeah, it is. Clearly you are. To that it was being sued for publishing or speaking content of a third party, which they didn't dispute. But they did, and this is where the district court kind of treated it the same, they did make the argument that META was contributing to the development or creation of the content by things outside of putting content in. So let me address that issue, because it is really, I think you did a nice job of boiling it down. That's the issue. Their claims are- Right, that's the heart of it. That's the heart of it. The heart of their claim. Okay. So in terms of framing the issues, then the district court basically said the third Barnes prong was pretty much undisputed, along with the first. Was that kind of a misframing of what's at issue? Because I see it the same way that Judge Nelson articulated it, which is what this case is really about is whether META made a material contribution to the fraudulent or misleading ads at issue, which is essentially the third issue in Barnes. Exactly. I think it's a bit of a labeling issue. I think the district court got it exactly right, because on that page where the court said that neither party disagreed on those principles, it then went to the heart of the issue, whether META could be viewed as creating or developing in part the content. And Judge Nelson, the court's roommate's decision and Kimsey and Dyroff, which directly support us and completely refute the plaintiff's position, interpreted the words creation and development from the Section 230. So this court has interpreted those terms, but they are, and the court was hewing to congressional intent by giving those terms meaning. And in roommates, the court squarely rejected this capacious view of develop. It said we're not going to say that just giving opportunities to come on the platform, soliciting or encouraging. I recommend footnote 19, where the en banc court said that the dissent was wrong, that simply encouraging or soliciting content would remove immunity. What about this percentages thing? Because I mean, it's an interesting view. I'm not sure I see how it gets to developing, but there is this idea that META is out there. I mean, what if they were meeting with some mobsters in Chicago and the mobsters said, hey, you know, we've got a lot of stolen goods we're trying to get rid of and, you know, half of them, and we also got to launder some money and, you know, we want to put up these ads. Would META lose 230 liability by saying, hey, this is how you do it. You know, submit your ad. Your Honor, that would be closer to some of these FTC cases where there really was participation. And I think one of the FTC cases that the plaintiff cited, they were doing exactly that. They were helping, the service was helping them craft their ads, so they would be deceptive, but they'd be mobsters. Well, but my hypothetical is not helping craft the ads. It's that they know that they are, you know, they're having a separate one-off meeting with an illegal actor. Do they get, and they're taking those ads knowing that, you know, this is someone who's illegal. Yes. If the lawsuit was like this one, premised on the fact that someone then saw that ad, that content on the platform and was injured by that failure to stop the information from getting on the platform, then Section 230 would provide immunity. And Congress made that decision explicitly balancing the need for free economic activity. And this goes to the, you know, one of my favorite quotes, the 10,000 duck bite quote in roommates, where the court said, it's exactly this kind of suit where parties would, the platforms would be sued fighting off claims that they encouraged or at least tacitly assented to the illegality of third parties. That's what they're saying. But as Judge Nguyen mentioned, it's just that, I mean, they're basically saying it's illegal to do business in China, and it's not. It wasn't illegal to meet in China and to encourage business. The policies of the United States government encourage commerce with China, and the fact that we all know that there's some percentage of people who are going to abuse these neutral tools, that's the whole point. And counsel, plaintiffs misinterpret the neutral tools language from roommates, from Dyroff. What about trying to get out of the firewall? I mean, their argument also seems to be, I mean, and it's interesting because if you go to materially contributes, the firewall has some, you know, argument has some legs because it wouldn't have been on there if they hadn't taught them how to get around the firewall. But if you go to creates or develops, it seems to fall apart. That's where it falls apart, Your Honor. And that's really, counsel is relying on Dyroff. In Dyroff, the plaintiffs allege that the platform there knew or should have known that heroin dealers were using the platform. They allege that the system put together the users. So this goes to this, you know, the used elements and the system, it was a heroin users user group. And this court interpreting roommates and HomeAway said, no, that's not contributing to the content of the speech on the platform that is alleged to have caused injury. That's the system. That's disseminating information and providing a mechanism. So this notion of getting around the firewall sounds evil. It's not. It's soliciting business and it's not non-neutral. The company goes out and solicits advertising from companies all over the world. And if they verify the product, they'll tell you how to get around the firewall. And if they don't verify the product, they'll still tell you. It's not like they're going to a select group. They're telling anyone how to get around the firewall. And yeah, exactly. How to get on the platform and how to proliferate and disseminate speech. And the Kimsey case is really, I think, telling here. There Yelp solicited reviews of businesses. Some of them were false. Some of them were negative. They then distilled, they took aggregate information. So they actually were modifying the content into the one star rating, which that was something Yelp came up with. And this court interpreting all these other decisions said that that was just a process of proliferating and disseminating the speech and content of others. And that wasn't even creating or developing. Exactly. Even though it did come up with a star and it took and distilled the information. So this court has taken a very broad view on these issues. Well, a very narrow view of creating. Yes. Yeah, a very narrow view of creating. A narrow view. And it's not just this court. Courts around the country, since we have Judge Seiler here, the Jones case from the Sixth  It's the Jones decision. It's Jones versus Dirty World Entertainment. And explicitly adopted roommates rejected this encouragement test that plaintiffs are articulating here. There it was really an extreme case. The website person would encourage local gossip onto the website and then would add his own comments. And the Sixth Circuit said that's still not developing the content of those third parties. It adopted the material contribution test. And counsel is very candid in their briefs. And today, they do not say, they do not allege that Meta had specific requirements for content, let alone suggested specific content. It had nothing to do with this content. It took it down. And that's the irony here. It took these ads down before the complaint was filed. Its policies forbid users from broadcasting. Almost though, with other Section 230 liability cases, where the problem, and this is out of our hands, I think, as a court, but the problem is the whack-a-mole nature of this. And I just, for business purposes, can't Meta or other social media platforms, can't they design a better system? Because there is sort of this allegation of they don't want to design a better system. Because if they did, they'd lose revenue. And so, I almost feel like behind the scenes, there's this discussion of how much fraud can we allow on our platform and get paid for, and still pass muster with the public. And I wish that the incentives, behind the scenes, I wish the business decisions were being made to say, we're done. Zero tolerance. And we're going to adopt a platform that just crunches us out. We have to be able to do that. I do think you're right. Again, the internet, it's now maturing, but it has been like a gusher of information that served tremendously positive purposes. But with that, with the freedom, come issues that need to be addressed. And I think Meta and others are working towards enhancing their ability to keep bad content off the platform, and to police fraud and other activities. And they spend enormous amounts of time and money to do it. Are they perfect? No. I'm not standing here saying they are perfect. But that's why Section 230 created this immunity. To say- I understand. I mean, Congress set the paradigm, and you're operating under the paradigm. And if I can address one point to you, Your Honor, because the policies are against, they've cited the terms of use, forbid fraud and other sorts of bad content. Right. I take it that there's also business incentive to maintaining the credibility of the platform by policing fraud, because otherwise nobody would order anything through an ad in Facebook. But let me ask you this, in your view, Mr. Brutus, can they ever allege, it's not present in this particular case, but they ever allege that a company like Meta would lose 230 immunity merely by the percentages alone? So I guess it's similar to Judge Nelson's hypothetical. If you're basically targeting a particular country or group of advertisers where, let's say, 5% of the ads placed are fraudulent, can that give rise to liability? No, Your Honor. Or is there a position that they can never do that? What about 100% fraudulent ads? It can't, Your Honor, unless they affect the actual specific content and the claim is based on that content. If you think about it here, counsel's not even arguing that these ads were from people who were recruited in China and got around the firewall. There's no connection between the harm that the plaintiff suffered, and so I think, Your Honor, unless the content is altered and modified in a material way by, and roommates is the classic example where the questions were, in this court's words, illegal. How can that be? How can the immunity extend that far, right? It's not a death by a thousand bites or whatever your favorite quote was. If it's virtually 100% fraudulent, at some point, encouraging and facilitating and materially contributing has to mean something. That would get us closer, and I think Judge Nelson's hypothetical went to this, that in some of the FTC cases, the platform or the service literally was going out and helping develop the fraudulent content and joining forces. In Dyroff, the court said that the allegations weren't enough for a conspiracy that would get you to a different place. That's an extreme hypothetical, and so theoretically, there's some level of participation where conceivably, not in this case and not against Meta, that the platform is helping the people create the material in a way that would meet the material contribution. It may be the 100% and saying, here's how you do it, here's how you make it look real. That was one of the FTC cases. So you're saying that to get away from this immunity, you have to have authorship or created this sort of ad before they can be held? Exactly. In whole or in part. So contributing in the en banc. Participation in the actual content. In the content. That's why in, I never really counted up, but in roommates, the en banc court said that the illegal content was required, it was forced, the platform required the illegal content that was discriminatory, therefore it was participating in part in the development of the content. Again, it went out of its way, the majority, to say that doesn't mean if you encourage posting, if you solicit certain types of information, that that removes immunity. On the additional comments box in roommates, where the user could just put anything else about themselves that might be relevant to their housing, including discriminatory things, because roommates had not required that and it was just the user giving the content, that was immune under section 230. So it's very clear, there are no cases that support plaintiff's position. It contorts and distorts the meaning of the words create and develop to say that going to China and recruiting people for your business and to do business with them is creating illegal content. And that's the key here. So can I ask about the contract claim? Because the contract claim seems to fall in a different category and I don't think the district court grappled with it in the way that it needed to be grappled with. It strikes me as odd that a contract claim could have exemption under section 230. Because at that point, you know, META is imposing additional responsibilities on itself. Why wouldn't just we read that and say, I mean, it seems odd that section 230 would say, well, you breached a contract, but because it was publisher activity, you're not liable for your breach of contract. That seems very odd to me. I think that the contract issue flows, as this court knows, from the Barnes decision, which was a very unique situation. It was a promissory estoppel contract-based argument. And there, the individual had specifically talked to someone at the interactive service provider. And that person said, I'm going to walk this over, I'm going to take this down, and then just never did anything. And the court said under common law tort, that was a separate duty that arose, not from the publishing or the activities that would fall under section 230, but this specific duty. Here, the contract claim is based on the terms of use, which by their own terms, don't create a contract. They're the terms imposed on the users. That may be true. But that's not what the district court said. The district court did not say this is not a contract. It just lumped it in and said you got section 230 liability. And that seems wrong to me. So my question is, can we decide on our own that this is not a contract? Or do we need to remand that back to the district court and say, look, section 230 liability doesn't apply here, but it may well be that this isn't a contract, but you need to decide that in the first instance. I don't think the court needs to do that because, but in this, I hear what you're asking, Your Honor. Here, this court made clear, again, in roommates and other sections, that the name of the state cause of action is irrelevant. If the gist of it, if the core of the claim is a claim that the platform should have either stopped material from getting on the Internet and on the website or should have taken it down, then section 230 preempts that claim. And section, whether it's a contract claim or a negligence claim, 10,000 different tort claims. You see, I read Barnes differently on that. I read Barnes as saying, no, you've got to look to the duty that's imposed, and the duties that are imposed under a contract claim are different. That's why, I mean, again, are there contract claims where they've said, here is a contract, the contract was breached, but you have section 230 liability? Immunity. Immunity. Yes, Your Honor. Yeah, immunity. Yeah, I think courts, mostly district courts, I think there may be an unpublished decision or two that has said, just calling it a contract claim does not remove immunity. Well, but it's, I don't think they're calling it a contract. I mean, the question is, is it a contract claim or not? And that's what I'm struggling with is, it may not be a contract. I don't know whether the terms of service are a contract or not. The district court certainly didn't delve into that issue, and that's the issue that's troubling me. And I don't know if, and you sort of made this as an alternative argument that, look, don't worry, this isn't a contract. You may be right about that. If we don't agree with you on the rest of this, can we just issue an opinion or a decision that says, hey, this is not a contract? Yes, Your Honor. End of story. It's a pure legal question. The terms of use say these are obligations imposed on the users to not engage in fraud, which we should encourage. That sort of policy. Kind of affirming on any ground that's supported by the record? Exactly. So, and here... Let me ask you this, counsel. Yes. Am I correct in recalling that the plaintiff in this particular case had an opportunity to but declined to amend the complaint? Yes, Your Honor. I'm glad you raised that because here, if they really thought the district court had misinterpreted their theory or had gone off the rails and decided an issue that, because the complaint wasn't clear enough, the court gave them the opportunity to clarify. They could have amended and tried to get around the clear law on Section 230 that forecloses their claims, and it's exactly... They didn't do it. And so, to come up now and say the district court was clueless, he didn't understand our claims, when they could have just amended to clear that up, it's not fair to the district court. I don't think it's a basis for giving them another chance here. And I just would finish with the fact that the policies here preclude fraudulent activity, and they're not promises. They're restrictions on the user. And back to Your Honor's point, I'll just end with it. There are incentives to have a dependable, reliable advertising place so consumers know they can go there and get products. So the incentives are not to flood the Internet with fraudsters. It's to keep them out and confront the challenges of doing that with so much information coming in. So, with all of that, I respectfully request that the court affirm the district court's decision. Thank you. Thank you, counsel. I think you're still on mute. Thank you, Your Honors, for a couple of minutes of additional time. I appreciate it. Hearing the arguments, we agree that this should be focused on the actual cause of action. The duty that's associated with negligence here is something that was actually looked at by district court only a few days ago in the social media cases, where the court said, because all persons are required to use ordinary care to prevent others from being injured as a result of their contact, defendants had a duty not to harm the users of defendant's of those platforms. When we have this discussion about development, the development is not limited to the actual words that appear on the page. Development has been adopted to mean, as the court has looked at and adopted only last week, albeit a district court decision, saying that we have to look at it from an overall perspective and we have to look at the duty as Judge Nelson identified, look at the duty of the cause of action. That's why this discussion about the percentages, and yes, we acknowledge one thing at zero and Facebook acknowledges something at 100% and we both agree that we're going to disagree regardless of the percentages. We look at that as a question of fact, that's a question that could be challenged on the merits. As to your negligence claim, basically. That seems to be where this is fitting in. You're saying they were negligent in how they were soliciting. Yes, we did allege that they were negligent and not soliciting. They were negligent in participation of the soliciting, not warning people about the fact that these false ads were coming from China and also, which we didn't get to, that your honors touched upon the promises that were made in the terms of use and what's important while I have 10 seconds is that the district court does not even say the word China in the entire decision. An amendment was futile when we're faced with the fact that the court did not want to look at our case from the perspective of the advertising that was being drawn into, not just encouraged, brought into their platform. Thank you for the additional time, Your Honor. All right. Thank you very much to both sides for your helpful arguments this morning. The matter is submitted for decision by the court.
judges: Siler, NGUYEN, NELSON